In the Matter of JOSEPH P. WALSH, an Attorney, Respondent.

Second Department, February 7, 1940.

*Harold M. Kennedy* [*Robert Abelow* and *Murray M. Halwer* with him on the brief], for the motion.

*Joseph P. Walsh*, respondent in person [*Stephen Callaghan* and *Ralph Stout* with him on the brief], for the respondent.

Per Curiam. An order was made by this court that there be an inquiry into certain alleged unlawful and unethical practices in the county of Richmond impairing the due administration of justice, and into other situations, to be conducted by the Supreme Court, at a Special Term thereof, before Mr. Justice Francis G. Hooley. The order designated Harold M. Kennedy, Esq., to assist in the conduct of the inquiry. By reason of testimony elicited during the investigation, a petition was presented to this court in which charges were preferred against respondent and request was made that action thereon be taken as provided by section 88 of the Judiciary Law.

The petition charged respondent with the following misconduct:

(a) That he corrupted or tampered, or attempted to corrupt or tamper, with certain jurymen who had been impaneled as jurors in causes in which respondent was engaged as attorney or as counsel.

(b) That he induced or attempted to induce certain persons to carry on the practice in his behalf of approaching jurors with intent corruptly to influence their vote, and furnished said persons with money or offered other inducements for such persons to engage in and carry on said corrupt practice.

(c) That having been requested to appear and testify before Mr. Justice Hooley, he stated that he would refuse to waive immunity from prosecution for any of his acts in connection with his practice and thereby willfully and knowingly concealed facts which render him ineligible to remain a member of the bar.

(d) That he attempted to distort or suppress testimony in evidence given or to be given or received or to be received before Mr. Justice Hooley in the inquiry mentioned.

Particulars of these offenses were given, especially with respect of the charge of tampering with jurors, six actions being specifically mentioned.

On December 13, 1938, the matter was referred to an official referee to take proof and report with his opinion. The learned referee filed a report with this court in which he expressed the opinion that respondent is guilty of all the charges and that he should be disbarred.

Respondent vehemently asserts that these charges, and any proof which tends to sustain them, are the products of a conspiracy against him involving three men, members of the bar — John A. Cosgrove, Francis P. Heffernan and Assistant Corporation Counsel George J. Conway. There is surely no proof in the case that justifies any such charge against either Heffernan or Conway. The learned referee has specifically found — and the finding is

justified — that Heffernan had little, if anything, to do with the investigation that was being made by the court. The referee made no reference to Conway, and there is no testimony which involves him. Cosgrove had been chairman of the committee on the unlawful practice of the law of the Richmond County Bar Association for eight to ten years and showed unusual activity in connection with alleged wrongdoing at the bar in Richmond county. There is testimony of witnesses (a small part of those examined — 21 out of 1,500) favorable to respondent, that Cosgrove had attempted to coerce them. However, there is no real proof that the energetic Cosgrove trespassed upon any of the rights of respondent. Respondent's opinion is strongly to the contrary. Respondent's views in this connection, together with his testimony on the whole case, must be received with careful scrutiny in the light of the fact that a part of his testimony, gratuitously given, cast a blight upon and seriously undermined, if it did not destroy, his own credibility. In the course of his examination respondent was attempting to discredit Cosgrove by showing the latter's lack of ability and, because of that, had developed for this proceeding a story that lacked common sense, respondent stating: " when he used to prepare cases for me I used to point out seven holes in every case he had, and I noticed one thing about him, he always came back with a better story after I told him about it. Q. Those cases where you were counsel? A. When I tried them. Q. But you went ahead and presented those better stories? A. Yes, I did, because I did not know whether it was on the up and up, and it was none of my business."

Respondent is thirty-five years of age, was admitted to the bar on November 6, 1929, and probably has the most active trial practice on Staten Island, where — it may be gleaned from the testimony — almost everyone knows everybody else. He has appeared frequently before this court and presented his arguments in a fair and capable manner. No other charges have ever been made against him. But, unfortunately, he has become involved in a miserable mess.

The official referee was liberal in the reception of testimony. He gave respondent every opportunity to present his defense and even permitted the opinions of respondent and others.

There are many relevant incidents involved in the charges and subdivisions thereof, and it is impossible in this opinion to present a detailed statement of all the facts bearing on all the charges.

Witnesses testified before the Special Term, making serious charges against respondent, and, upon appearing before the official referee, recanted in whole or in part; and, in some cases, after

having retracted, went back in part to the original testimony. Some of the witnesses with whom respondent is charged with having dealt in connection with the tampering with jurors were unreliable persons and, were we dependent upon their testimony alone, even though respondent has been discredited, there might be some doubt that they were telling the truth; at any rate, there would be hesitancy in believing their stories. However, there were others who did tell the truth and the support of their testimony and the surrounding circumstances cause a real measure of truth to rise even from the testimony of the unreliable ones. Such men as Cogan, Nasella and Sullivan, who were informers and recanted in whole or in part on the hearing before the official referee, were unworthy persons; yet, in light of all the testimony in the cases in which each was involved, it must be found that respondent joined with them in nefarious transactions which did violence to the true administration of justice.

One of the cases which, in particular, fully justifies that conclusion is *Larson* v. *City of New York* which was tried by respondent on March 3 and 4, 1938. Here some of the details must be given.

Anibal Silva was a juror in that case. He had lived on Staten Island for twenty-six years and was engaged in the radio business in the borough of Manhattan. Before he was selected as a juror he was spoken to by one Nasella, whom he had never met before. It appears that Nasella, who had served on juries, was known to respondent and believed by him to be untrustworthy, but one who should not be antagonized. Nasella asked Silva if he wanted to make some money and said if he were picked as a juror in the *Larson* case, respondent would " fix him up." Silva told Nasella that he did not believe in making money that way. After the trial was over, according to Silva, he was again approached by Nasella in the court house. Nasella wanted to know if he could meet him so he could give him some money. Silva, who had participated in a unanimous verdict in the sum of $9,000, said he did not want any money. The day the trial was over, and later, Silva spoke to Assistant Corporation Counsel Conway, who tried the case for the city, about this incident. It is not claimed that Cosgrove knew anything about the Silva incident. It is likely, therefore, that the attention of Mr. Kennedy to Silva was called through the assistant corporation counsel. There was an attempt to attack the credibility of this witness, but it did not succeed.

Mary Silva, a daughter of the juror, testified that Nasella came to their home on the Saturday following the trial. She was at home alone. Nasella said he had some money for Mr. Silva. Having asked from whom the money came, Nasella said to tell

him that he was the man he saw at the court house. He gave her a twenty-dollar bill and asked for two dollars change with which he wanted to buy gas for his car. She gave him the two dollars. Just then her brother Arthur came in the house and wanted to know what it was about. His father had told him about the court house incident with Nasella and, upon learning what the money was for, he told his sister to give back the twenty-dollar bill to Nasella and Nasella returned the two dollars.

Arthur Silva, the son of the juror, testified that he arrived home on the Saturday mentioned. He was with his mother. Upon his inquiring what Nasella wanted, he was told by his sister. He asked Nasella if he was the fellow from " down the court." When the latter said yes, he told his sister to give the money back because his father did not want it.

None of the Silvas had known Cosgrove until they were called before Mr. Justice HOOLEY.

Nasella testified that he knew that Silva had been a juror. He admitted that he had made overtures to Silva, a suit of clothes being the consideration. This seemed to satisfy Silva. Subsequently, he went to Silva's home where he saw a couple of women and another man. He handed twenty dollars, which he had obtained in respondent's office, to the young lady but the twenty dollars were returned and he gave back the two dollars he received, as the brother and sister had testified. Nasella's story of how he had obtained the twenty dollars is rather fanciful. He had gone to respondent's office without appointment. Two of respondent's associates were there. Nasella went into respondent's private office. Respondent entered later. Nasella did not speak to him. On the desk in the private office there was an envelope with his name on it. It contained twenty dollars. He had not asked for it. He was not told that the money was to be taken to Silva.

Of course, if he is believed as far as he has gone, omissions may be readily supplied.

After the transaction with the Silvas, he said he called respondent's office and presumed he was talking to him. On cross-examination it developed that respondent was out of town at the time that he telephoned, but he said that the voice sounded like respondent's.

Of course, respondent denies any connection whatsoever with this transaction. He denies that he induced Nasella to do what Nasella said he did. Here, as in all the other incidents, respondent sought and found to his own satisfaction a reason why witnesses should be biased and testify against him. Respondent said that in behalf of a client he had commenced an action against one Weilgus, who lived part of the time with the Silva family; that in behalf

of Weilgus, respondent was visited by Arthur Silva, who sought to have him discontinue the action; because he refused, a wordy altercation ensued, Arthur Silva used foul language, and respondent struck him. Although one of respondent's associates said that he made an effort to serve papers on Weilgus, no summons or complaint was produced out of the files of respondent to indicate that an action for $3,000 had been brought against Weilgus, as respondent stated there had been, nor was any record produced showing such service.

John J. Clancey, a young lawyer who was associated with respondent, testified that he was present when Arthur Silva came into the office. Silva was referred to respondent and went into his office, after which there were loud and excited voices heard. When Silva came into the office, he told him he was a friend of Weilgus, but he did not tell him that his name was Silva. He recognized him on the stand before the official referee. To Clancey had been given the summons and complaint to be served on Weilgus, but he was unable to serve him. He did not produce any such papers.

Arthur Silva denied that he was ever in respondent's office, that he had ever seen respondent until the investigation proceeding, or that he knew of an action against Weilgus.

Respondent testified that he was receiving information, unsolicited, from friends from time to time as the secret investigation was progressing at Special Term. It is likely he learned that he had become involved in it. Respondent had heard that somebody by the name of Silva had given testimony concerning him. This was in the latter part of June, 1938, after this court's decision in *Matter of Murphy* (254 App. Div. 770), of which respondent said he knew nothing. He examined the telephone book and found a number of subscribers named Silva. One of them he found lived in the neighborhood of a friend named McAuliffe. On a rainy Sunday night he went to McAuliffe's home at ten o'clock and asked McAuliffe if he knew a Silva who lived in the neighborhood. McAuliffe told him that he did, and thereupon respondent requested McAuliffe to visit Silva that night and to ask him what " this is all about." At ten-thirty o'clock that night McAuliffe visited Silva's home, woke him up, and found him " quite crabby." Silva told him that he knew a man named Nasella; and he (Silva) had sat on a jury in a case of respondent's, *Larson* v. *City of New York*. That was all he learned on that visit. McAuliffe said to respondent he might get further information during the week because Silva was annoyed on account of being awakened. Respondent asked McAuliffe to see Silva again to find out what was at the bottom of it all; that there were two

people in the investigation who would not hesitate to make a man change his story. Of course, Cosgrove and Heffernan were meant. Heffernan had nothing to do with this matter and there was no proof that Cosgrove knew Silva until the hearing before the Special Term. During the following week, respondent went back to McAuliffe's house. McAuliffe told him he had made inquiries but could not tell what it was about; that Silva had gone to Brooklyn; that he said that Nasella came to him and offered him some money and he would not take it; that thereafter Nasella went to his home and offered money to his son and his son would not take it. Then respondent volunteered testimony from which it appeared that, upon leaving McAuliffe and walking down the steps of the latter's home, he saw a young man sitting on the Silva stoop. He then recognized him as one who had been in his office. He asked McAuliffe who it was and he was told that it was Silva's son, Arthur Silva. To him this was very significant. He also found that Silva was a committeeman for Heffernan when the latter was running for district attorney against Mr. Innes, respondent's former associate. As stated, there is nothing in the case to show that Heffernan had anything whatsoever to do with the Silvas in connection with this matter.

The elder Silva had testified that McAuliffe came to his home and threatened that, if he went to court and testified that Nasella had given him money, he was going to make trouble for him; and also asked him, if he went to court, not to say that Nasella gave him any money. This was denied by McAuliffe.

There is no doubt that Nasella's visit to the Silva home and the transaction with reference to the twenty dollars took place. There is no believable reason suggested for a conspiracy between Nasella and the Silvas. The receipt of the twenty dollars by Nasella at respondent's office is a distorted presentation of what actually took place. If the Silvas are to be believed and respondent discredited, it may be readily conformed to fact. The question of veracity between Arthur Silva on the one side and respondent on the other is very important. Did Arthur Silva visit the office of respondent? There is nothing in the case which indicates untruth in the testimony of Arthur Silva, especially as the attack comes largely from respondent, whose credibility has been so seriously impaired by his own words. Furthermore, there was no proof except the word of respondent and Clancey that there was a Weilgus action. Weilgus was not called as a witness. The action allegedly had been commenced only about a year before the hearing. Why were not the summons and complaint and respondent's record book produced to show that there was a Weilgus

action? Clancey says that he did not serve Weilgus with the summons and complaint. There was no proof that they were served, except respondent's statement to that effect. Yet it is said that Arthur Silva came into the office with a copy of the summons and complaint against Weilgus. Furthermore, the visit of respondent on a stormy Sunday night to the home of McAuliffe and his request that the latter visit the home of Silva a short time before midnight and to make a further visit — McAuliffe's two visits being for the purpose of ascertaining what the Silvas had testified — and respondent's subsequent visit to McAuliffe, are not without their serious significance. It all strongly suggests guilty knowledge. The identification of Arthur Silva sitting on a stoop just at the time of his second visit to McAuliffe in the day time is not impressive. The story is of doubtful validity. Was it not injected to suit the occasion — to find a reason for prejudice on the part of the Silvas?

Although there were inconsistent and contradictory statements and some situations were not fully developed, taking all of the proof and sifting it down to a meaningful level, together with the fair inferences therefrom, there is valid and substantial basis for holding that Nasella approached juror Silva for corrupt purposes in behalf of respondent, and later received twenty dollars from respondent to give to Silva. This conclusion is reached without a consideration of respondent's conduct in the other cases.

In view of this determination, which carries with it the severest penalty, it becomes unnecessary to go into the details of the other cases in which respondent is charged with having tampered with jurors.

In the case of *Schick* v. *City of New York*, which was tried by respondent on April 8 and 9, 1937, two of the jurors were Cogan and Nasella, the latter of whom in 1938 became an intermediary in the *Larson* case, above discussed. Cogan, who was casually known to respondent, testified that, before he was drawn on the jury, he was approached by respondent, who mentioned that he was on the jury panel and asked him to do what he could for him. Cogan was drawn on the jury, as was also Nasella. The result of the trial was a verdict in favor of plaintiff for $10,000. Thereafter Cogan met respondent, who gave him fifty dollars and told him to give Nasella half. This was done. Later respondent went to his home and gave him fifty dollars, of which he gave twenty-five dollars to Nasella.

That same month there was another case called, *Carulli and Another* v. *Metropolitan Life Insurance Company*, in which respondent represented Carulli. Nasella was on that jury. Respondent

asked Cogan to see what he could do with Nasella in that case. Cogan spoke to Nasella and told him that respondent would take care of him if he should sit on the jury. The *Carulli* case was tried April 22 to 28, 1937. A sealed verdict was rendered for one plaintiff for $30,000, and for another plaintiff for $40,000. These verdicts were set aside. After the trial of the case Cogan had a talk with respondent at Cogan's home. Respondent gave him fifty dollars and asked him where Nasella was. Cogan then went with respondent to a certain place on Staten Island where he found Nasella and a meeting was arranged between Nasella and respondent. Cogan says he did not see what took place but he saw money in Nasella's hand after the meeting.

It appears from Nasella's testimony that he had been serving on juries. According to Nasella, after he had been selected as a juror in the *Schick* case, Cogan told him to do the right thing — a big verdict — and he would take care of him. However, Nasella says he voted as he heard the testimony. He met Cogan after that and received twenty-five dollars from him, and then an additional twenty-five dollars. At the same term he sat in the *Carulli* case. He again had a talk with Cogan, who told him that somebody had requested that he bring in the biggest verdict he could. After the *Carulli* case, he received money from Cogan. He admits that he went to the place on Staten Island where respondent was in a car. Although at first he said that he saw respondent in the car, he later said that he did not see him in the car, but that Cogan told him respondent was in the car. Cogan says that Nasella went to the car and came back with money; but Nasella says that he did not go to the car, that Cogan gave him the money. There were some variations and contradictions in the testimony but, generally speaking, the foregoing is the substance of what these two men testified.

Respondent emphatically denied that he had any relationship with these two men such as they testified. His opinion of Nasella has already been indicated. He testified that Cogan had no particular animus against him.

The proof in the *Schick* case and in the *Carulli* case justifies a finding that respondent engaged in the corrupt practices in those cases with which he is charged.

In the case of *Dahl v. City of New York*, tried in November, 1937, there was a resident of Staten Island by the name of Sullivan, who interested himself in behalf of respondent. He had been acquainted with respondent and had served on a jury in a case in which respondent was counsel. He told respondent that he had a relative on the Dahl jury who, he thought, could help respondent.

The latter told him to offer the man a fantastic sum, which Sullivan took to mean fifty dollars. Sullivan visited a juryman by the name of Hogan and made overtures of money to him, but Hogan refused to participate in the ignominious transaction. Hogan testified accordingly. Sullivan also testified he had been told by respondent that if he was called as a witness before Judge Hooley, to deny anything in regard to moneys paid to him. He also said that he had received money for his services in the sum of twenty dollars, in addition to which respondent admits that he gave him twenty dollars for four days' services as a witness in the case of *Blake* v. *Bus Company* in April, 1937. Sullivan said that the written statement which he had made contained what Cosgrove told him to write. In this statement he says he was informed by respondent that if he was summoned in the investigation, " to deny the facts in regard to any crookedness on his part or seeing anyone in regard to helping him in any way."

There was an attempt to discredit Hogan, but it was fruitless, except he admitted that he failed to notify the court that he had been approached. Of course, Sullivan was a rascal and would not ordinarily be worthy of belief, but Hogan's testimony and other circumstances and facts in this record of the *Dahl* case indicate that respondent was capable of doing and did just what Sullivan says he did. Here there are also some circumstances to the contrary but, weighing all the facts, there is corroboration of Sullivan which warrants a finding that respondent paid him money for attempting to influence jurymen, although Sullivan says he received it as a matter of charity. The testimony of Sullivan also shows that respondent attempted to have Sullivan evade the truth before the Special Term.

The *Colliton* and *Legisman* cases were tried by respondent in April, 1938. A man named Greb was a juror in both of these cases. Sullivan told respondent that he knew Greb as a neighbor and thought Greb could do something for respondent. He told Greb that respondent might get a job for him (Greb). Greb testified that several months after he had served as a juror a man came to his house and gave him some money in an envelope. Greb first said that he did not think the man who gave him the money was respondent, and then said it was not respondent. Sullivan testified that he had received twenty dollars from respondent. Respondent admitted that he had been approached concerning a job for Greb, but refused to do anything about it. He denied giving any money to Sullivan except the twenty dollars by check for the time spent by Sullivan as a witness in the case of *Blake* v. *Bus Company*, as above stated.

While the proof is insufficient in the *Colliton* and *Legisman* cases to show that any juryman was " fixed," there is ample evidence to support a finding that respondent gave Sullivan money for that purpose. That Sullivan first testified against respondent is undoubtedly due to the fact that he was confronted with a statement made by Hogan, and thereupon made a statement in which he involved respondent. He afterwards claimed that he was forced to make the statement by Cosgrove.

In view of the foregoing it will be unnecessary to consider the charge with respect of the refusal of respondent to waive immunity before the Special Term.

The official referee has found respondent guilty of all charges. The court agrees with the conclusions of the referee to the extent indicated, and finds that respondent has been guilty of corrupting and tampering with jurymen who had been impaneled as jurors in causes in which he was trial counsel, and of attempting so to do, and of attempting to induce a witness to swear falsely before the Special Term.

Respondent, unfortunately, was not satisfied with the success which his talents had won for him, but sought by devious ways to make assurance of success doubly sure. He must be disbarred.

The motion to confirm the report of the official referee should be granted and respondent disbarred.

Present — LAZANSKY, P. J., JOHNSTON, ADEL, TAYLOR and CLOSE, JJ.

Motion to confirm report of official referee granted, respondent disbarred and his name ordered to be struck from the roll of attorneys.